ERNEST R. NUZZO, ESQ. # 3231
65 Ramapo Valley Road, Ste 102
Mahwah, N.J. 07430
(201) 512-3200
**Kathy@ernuzzo.com**

*Attorney for Plaintiff Pop Test Cortisol LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **POP TEST CORTISOL LLC,** <br><br> **Plaintiff** <br><br> v. <br><br> **THE UNIVERSITY OF CHICAGO; SUZANNE D. CONZEN; THE CONZEN RESEARCH LABORATORY; DENG PAN, MASHA KOCHERGINSKY, C. RIK BROEKKAMP; BERNARD PEETERS a.k.a. "Ard Peeters"; TRACIE CAREY; MARTY HUBER, JR., BEATA VAN ROSMALEN; HENKJAN GELLEKINK; CHARDON PHARMA, a Foreign Jural Entity; and CORPORATE DOES 1 through 100 and JOHN and JANE DOES 1 through 100** <br><br> **Defendants** | Civil Action No. _____ <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Pop Test Cortisol LLC (sometimes referred to as "Pop Test"), for its Complaint against Defendants, including The University of Chicago ("University of Chicago"); Suzanne D. Conzen; ("Conzen"); The Conzen Research Laboratory ("Conzen Lab"); Deng Pan ("Pan"); Masha Kocherginsky ("Kocherginsky") (collectively the "University Defendants"); C. Rik Broekkamp ("Broekkamp"); Bernard Peeters a/k/a Ard Peeters ("Peeters"); Chardon Pharma ("Chardon") (collectively the "Merck Netherlands Defendants"); Tracie Carey ("Carey"); Marty Huber Jr. ("Huber"); Beata van Rosmalen ("van Rosmalen"); Henkjan Gellekink ("Gellekink") (collectively the "Merck Employee Defendants"); the Corporate Does; and the Jane/John Does, hereby alleges as follows:

## PARTIES

### Plaintiff

1.     Plaintiff Pop Test is a New Jersey Limited Liability Company, with its principal offices at 36 Cecelia Avenue, Cliffside Park, New Jersey.

### Defendants/Conspirators

2.     Defendant University of Chicago is a private research university with a principal place of business at 5801 S. Ellis Ave., Chicago, IL 60637. Defendant University of Chicago does business in and/or has significant contacts with this district, including, but not limited to, conducting fundraising in this district; sending admission counselors to this district to assist potential students apply for

admission; providing general liability insurance for alumni volunteers, and a global web site http://www.uchicago.edu/ with intent and effect to include this district.

   3.  Defendant Conzen is a Professor of Medicine in the Section of Hematology/Oncology at Defendant University of Chicago; is the head of/lead investigator in Defendant Cozen Lab; Defendant Conzen is the daughter of W.H. Conzen the former Chairman and Chief Executive of the Schering-Plough Corporation; Conzen who has a principal place of business at 900 E. 57th Street, KCBD, 8240F, Chicago, IL 6063; and who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims, the locus and impact of which and damages caused by occurred within this district.

   4.  Defendant Conzen Lab is a research entity operating within the University of Chicago headed by Conzen; which has a principal place of business at 900 E. 57th Street, KCBD, 8240F, Chicago, IL 60637; and which actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims.

   5.  Defendant Pan is a molecular biologist who at all times relative hereto was employed by and/or conducting research at University of Chicago and; who has a last known address of 6236 S. Dorchester Ave, Chicago, IL 60637; and who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims, the locus and impact of which and damages caused by occurred within this district.

   6.  Defendant Kocherginsky is a statistician, Research Associate and Associate Professor in the Department of Health Studies at the University of Chicago; who has a principal place of business at 5841 S. Maryland Ave., MC 2007, 312A, Chicago, IL 60637; and who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims, the locus and impact of which and damages caused by occurred within this district.

7.      Defendant Broekkamp is a Dutch national intellectual property attorney employed by Merck & Co., Inc., Schering-Plough Corp. and N.V. Organon (collectively "Merck"); who has a last known address of Dennenlaan 6, 5342 HX, Oss, The Netherlands; and who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims., the locus and impact of which and damages caused by occurred within this district.

8.      Defendant Peeters was at all times relevant to Pop Test's claims the chief scientist at Merck overseeing the development and commercialization of ORG 34517; who has a last known address of Berghemseweg 8, 5373 KH, Herpen, The Netherlands; and who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims., the locus and impact of which and damages caused by occurred within this district.

9.      Defendant Chardon is a Netherlands entity through which Defendants Broekkamp and Peeters misappropriated Pop Test's trade secrets and/or intellectual property for use in developing and commercializing the ORG 34517 compound.  Although Chardon conducts business in and has substantial contacts with this district, it is incorporated in the Netherlands and has a principle place of business at Berghemseweg 8 5373 KH Herpen The Netherlands.

10.     Defendant Carey, at all times relevant to Pop Test's claims, was an associate director of regulatory affairs at Merck responsible for the submission of documents to the United States Food and Drug Administration ("FDA") that contained trade secrets/intellectual property misappropriated from Pop Test; who is a resident of this district with a last known address of 340 Kingsland Street, Nutley, N.J. 07110.

11.     Defendant Huber, at all times relevant to Pop Test's claims, was a vice president, of Merck who participated in the submission documents to the FDA that contained trade secrets/intellectual property misappropriated from Pop Test;

4

who is a resident of this district with a last known address of One Merck Drive, Whitehouse Station, New Jersey, 08889.

12.     Defendant van Rosmalen, at all times relevant to Pop Test's claims, was material coordinator at Merck; who actively participated in and/or directed the transactions and occurrences that form the bases of Pop Test's claims., the locus and impact of which and damages caused by occurred within this district; who has    and was intimately involved in and/or directed the transactions and occurrences that form the bases for Pop Test's claims, the locus and impact of which and damages caused by occurred within this district, including but not limited to her involvement in the wrongful and illegal shipments of Pop Test's ORG 34517 which was used by the University and Netherland Defendants to capitalize on the trade secrets and/or intellectual property that was misappropriated from Pop Test; is a Dutch national with a last known address of Hambakenwetering 15, 5231 DD's–Hertegenbosch, The Netherlands.

13.     Defendant Gellekink, at all times relevant to Pop Test's claims, was a global regulatory affairs scientist at Merck and was a member of Chardon who participated in the submission documents to the FDA that contained trade secrets/intellectual property misappropriated from Pop Test.   Although Gellekink conducts business in this district, including activity related to the transactions and occurrences that form the bases of Pop Test's claims, he is a Dutch national who has a last known address of Hambakenwetering 15, 5231 DD's–Hertegenbosch, The Netherlands.

**Non-Party Co-conspirator**

14.     Merck is a principle co-conspirator in the transactions and occurrences that form the bases of Pop Test's claims.  Merck Schering Plough Organon is a New Jersey corporation with a principle place of business at One Merck

Drive, Whitehouse Station, New Jersey, 08889. Note: The Merck Defendants were sued in the New Jersey Superior Court, Chancery Division, Bergen County on March 6, 2013 in an action seeking certain emergent relief for inter alia patent cancellations. The matter ended with orders for arbitration as to "Merck" only; was appealed by Plaintiff to the Appellate Division; then to the New Jersey Supreme Court; and then to the United States Supreme Court on a Petition for Certiorari, Docket #14-447 filed October 15, 2014 where the case is presently pending. At the time of the entry of the Orders in the Chancery Division, a Netherlands Defendant removed the case to this New Jersey District Court, District of New Jersey on June 3, 2013. Docket#2:13-cv-03428-WJM-MF. Same was remanded sua sponte for lack of jurisdiction.

## JURISDICTION AND VENUE

15.     This is a civil action arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1991 et seq. ("RICO"); the patent laws of the United States, 35 U.S.C. §§ 101 et seq.; as well as, various provisions of the common and statutory laws of the State of New Jersey.

16.     This Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1964(a); 28 U.S.C. §§ 1331, 1367, and 1338.  With respect to Pop Test's state law claims against the defendants that do not reside in the State of New Jersey, these are claims brought pursuant to 28 U.S.C. § 1332 between citizens of different states and/or citizens of the United States and Citizens of the Netherlands' and the amount in controversy exceeds $75,000.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), (b), (c), and/or (d).

18.     This Court has personal jurisdiction over all the Defendants as a substantial part of the events giving rise to Pop Test's claims occurred in this district

and all Defendants are subject to personal jurisdiction in this district, having had more than minimum contacts with this district, as their conduct and connection with this district are such that they should reasonably anticipate being haled into Court here.

## PRELIMINARY STATEMENT

19.     This matter references a related, small, virtual, entrepreneurial organization founded as Pop Test LLC that initially, independently developed saliva-based diagnostic products, including glucose, cholesterol, cortisol and others.

20.     This legal action relates to the cortisol platform of Pop Test LLC, cortisol being in the instant case the molecule being detected, cortisol being the stress hormone produced by the adrenal gland that inter-alia affects the human central nervous system ("CNS").

21.     The cortisol "diagnostic" developed by Pop Test LLC referenced at Paragraph 19 & 20 above was a logical lead- in to a serendipitous product developed years before by Organon (Division of Schering Plough) and later Merck Sharp & Dohme  known as ORG 34517, a cortisol blocking drug patented and clinically developed for the treatment of psychotic depression.

22.     The Pop Test LLC's proprietary diagnostic had the promise of being and was an enabler for the Organon drug by expeditiously monitoring the human cortisol levels in saliva, not blood, and which is rapid, non-invasive, user-friendly and inexpensive.

23.     From this synergy, relationships were formed, and decisions made by Merck to sell, to the "Plaintiff" herein, Pop Test Cortisol LLC who was formed as the entity and platform to acquire ORG 34517 for the purpose of psychotic depression drug development. The intellectual and physical property related thereto

was purchased/acquired, contracts made, studies designed, funds expended, patents assigned and the product(s) development immediately begun by Plaintiff.

24.     For reasons well known to most of the Defendants herein and certainly by the complicit non-party conspirator Merck, as shown herein, Merck breached their obligations pursuant to the terms of Agreement dated December 7, 2010 (the "December 7th Agreement"), virtually after executing the document, a copy of which is attached hereto as Exhibit 1 the contents of which are incorporated herein by reference, in which Plaintiff Pop Test purchased from Merck four globally-filed patent families, and licensed two patent families, all relating to psychotic depression.

25.     Merck belatedly determined they made a huge and historic mistake in disposing of an "Organon" discovery/product that had the potential for actual financial benefit, the ORG 34517 drug, and its potential mechanisms for therapeutic action in cells and tissues of all organs, not limited to the CNS (Central Nervous System).

26.     ORG 34517 was one of at least seven (7) "Schering" products Merck determined to sell or dispose of after the purchase/merger of Schering, all of which were called back, save "Organon" ORG 34517, which had on December 7, 2010 already been sold to Pop Test.

27.     This case includes the development of conjoined and nefarious plots, with plans to re-obtain ORG 34517, not by purchase, not by negotiation, but by causing the destruction, failure and demise of Pop Test.

28.     The facts of an apparent unlawful plot/conspiracy by non-party Merck and the named Merck Employee Defendants herein and other employees, were determined and outlined in a factually detailed and good faith letter sent by Pop Test to the Executive Vice President of Merck who was also its General Counsel; to the President and CEO of Merck; and Merck's Executive Vice President and Chief

Ethics and Compliance Officer (at Merck's Headquarters in New Jersey) dated November 1, 2011 (the "November 1st Letter"), a copy of which is attached hereto as Exhibit 2 the contents of which are incorporated herein by reference

29.     The November 1st Letter hoped to obtain contractually mandated Seller/Licensor assistance, see Exhibit 1 at ¶ 8.4, in correcting the serious problems in the relationship.

30.     Unexpectedly no contractually owed action was forthcoming other than in-house Merck Counsel's dismissive statement that "Merck did not sell you cancer patents, so it does not have to defend cancer patents". He also stated Merck has "no further obligation under the Contract".

31.     Also delivered to the said Chief Executive Officer, General Counsel and Ethics Officers of Merck on November 1, 2011 was a copy of the predicate loose-leaf binder/folio of hundreds of E-Correspondences unexpectedly revealed to Pop Test on October 28, 2011 involving Merck employees, including the Merck Employee Defendants named and to be named as Doe Defendants herein; the University of Chicago, Conzen, The Conzen Lab, the other University Defendants, and the Merck Netherlands Defendants, a copy of an outline of the E-correspondence, a copy of which is attached hereto as Exhibit 3 the contents of which are incorporated herein by reference.

32.     This "outline" of e-correspondence is the product of the review by Pop Test of the contents of its Apple laptop computer that was provided to the Merck "Transition Team" and returned to Pop Test. Same was translated into English, and the conspiracy referenced in this Complaint rendered manifest. The detail of the return of the computer is covered in detail infra. Note: throughout this Complaint e-mail exhibits from the Apple laptop computer are presented in both the original Dutch correspondence followed by the English translation.

**Historical Predicate**
**For Sale of ORG 34517**
**And Origins of the Conspiracy**

33.     As stated at Paragraph 19 & 20 above; Plaintiff developed a patented, proprietary diagnostic for cortisol, which had apparent efficacy and commercial synergy with the ORG 34517 psychotic depression patented drug.

34.     Merck having purchased Schering who had theretofore purchased Organon (Netherlands), obtained in the merger a folio of drugs identified for disposition in sale or out-license transactions to eliminate from the Merck inventory products, mistakenly in the case of ORG 34517, Merck had determined were destined to fail.

35.     Prior to the closing of the Schering/Organon merger with Merck, the merger met with serious Federal Trade Commission ("FTC"), resistance for anti-trust/monopoly reasons arising from their "Rolapitant" drug, which held up the merger.

36.     This "clog" in the merger was eventually relieved by Merck/Schering/Organon selling to a third party the problematic drug/technology and obtaining the requisite FTC approval for the merger.

37.     This extensive delay exacerbated their diligence, and expedited the "transactions out-licensing program" (disposition of surplus drugs inventory), clothed in an internal and public relations guise to justify the disposition(s).

38.     Dispositions (thinning inventory/overhead) represented a "good story" within Merck and to the public, since the drugs disposed of were deemed destined to fail. Indeed, the President of Merck made a public announcement (post-merger) of their paradigm for Merck to be a "licensing partner" of its drug technologies.

39.     ORG 34517 was one of seven such "disposables" placed on the block, and the only one actually disposed of as its sale was closed expeditiously in the December 7th Agreement with Pop Test.

40.     All seven drugs were ordered back by Merck, but the Pop Test sale which expeditiously concluded on December 7th, made the sale to Pop Test of ORG 34517, a drug that had great potential (not a disposable), and certainly not a drug that could objectively sustain credence as "destined to fail", a serious mistake.

41.     This dynamic, the purchase of Schering/Organon and their line of products, and the decisions for disposal of lines of product, had a more lengthy time line consistent with such intricacies, legalities, and bulky bureaucracies.

42.     The down-side to such "dispositions" is vertent or inadvertent disposal of a "gem"; professional and corporate embarrassment, and careers that could become in issue; exacerbated by the unique fact that Merck SOLD to Plaintiff the technology in the context of the out-licensing paradigm, and for NO money down ("milestone payments"), which was more than embarrassing, and is explicative of what is thematic in these proceedings, the "STUPID TO VENAL" activities outlined herein of the Defendants  parties and non-parties conspirators.

43.     The sale of ORG 34517 was initiated at Schering and expedited with Schering employees, but ultimately and inappropriately negotiated  / concluded / administered by the Merck employees, which in the end was doubly embarrassing for Merck.

44.     The solution for Merck and the other co-conspirators - Insure Pop Test Fails! – hide the STUPID, perform the VENAL.

45.     Additionally, during the apparently lengthy and perhaps unexpected FTC monopoly review of the Merck Schering/Organon merger, Merck was required by Netherlands law to retain and pay the Dutch "Organon" employees, including Peeters, who was the lead ORG 34517 scientist appointed by Merck to the

transition team pursuant to the December 7th Agreement, and Broekkamp, who was the lead ORG 34517 intellectual property attorney assigned by Merck to the transitional team pursuant to the December 7th Agreement, for YEARS who essentially had little or nothing to do except to re-employ or hatch plot(s) to purchase, take, convert drugs for personal development.

46.     Peeters, Broekkamp and the remaining Netherland Defendants were during this hiatus period attempting to purchase or license other Organon-drugs for their personal development, but were denied by reason of Merck's corporate policies that prohibited the selling/licensing of Merck drugs to employees – thus was born the conspiracy to steal ORG 34517 from Pop Test.

47.     The effects of the Netherlands laws that protects against closure of businesses in its borders on Merck were compounded by the picketing of the Organon facilities and street disturbances in Oss, Netherlands over the announced intention by Merck to close the facilities there.

## STATEMENT OF FACTS

### Merck And The Merck Employee Defendants

48.     The December 7th Agreement, see Exhibit 1, selling Pop Test the ORG 34517 drug and patents, required inter-alia, that Merck perform/deliver to Pop Test the following, all of which did not occur in clear breach of Merck's contractual obligations:

a. ORG 34517 Formulae synthesis and know-how, see Exhibit 1 at ¶¶ 1.10, 1.20, and 1.3,

b. All regulatory documents and records regarding ORG 34517, see Exhibit 1 at ¶ 1.10.

c.  The "Stock" of ORG 34517, which included 30,000 +/- capsules of finished product and 30 K capsules placebo, and the ORG 34517 active pharmaceutical ingredient (API), see Exhibit 1 at ¶ 1.36.

d.  The ORG 34517 related "Know-how," then possessed by Merck, see Exhibit 1 at ¶ 1.26.

e.  The "Manufacture" data for ORG 34517, see Exhibit 1 at ¶ 1.28.

f.  The "Proprietary Information" then in the possession of Merck, including scientific, clinical and regulatory etc., see Exhibit 1 at ¶ 1.31.

g.  The ORG 34517 "Records" research and development reports, clinical study reports, and regulatory documents submitted to regulatory agencies, see Exhibit 1 at ¶ 1.32.

h.  Merck would protect and hold confidential the sold/assigned intellectual property trade secrets, know-how and the like, see Exhibit 1 at ¶ 8.4.

49.  Merck, with the aid and assistance of the Merck Netherlands Defendants and Merck Employee Defendants, did not provide the formulae, synthesis and know- how for twenty-two (22) months after the effective date of the December 7th Agreement with the intent to defraud Pop Test of its supply of ORG 34517.

a.  Merck, with the aid and assistance of the Merck Netherlands Defendants and Merck Employee Defendants, to present date has failed to provide the ORG 34517 "Stock," see Exhibit 1 at ¶ 1.36, to Pop Test, i.e., the 24,000 ORG 34517 Capsules, placebos and the approx. 15 lbs. of ORG 34517 API, less the parsimonious "one tablespoon" referenced in paragraph 51 below.

b.  Incredibly, Merck (with the 20 months late delivery of the 10,000 capsules that Pop Test PAID FOR, also sent one (1) tablespoon (yes one tablespoon) (20 grams) of the existing 15 pounds of inventoried "stock" of Pop Test's

ORG 34517, a copy of the UPS manifest, which is attached hereto as Exhibit 4 the contents of which are incorporated herein by reference.

c. Merck, with the aid and assistance of the Merck Netherlands Defendants and Merck Employee Defendants, also finally provided the regulatory documents and records, the "Know-How," the "Manufacture Data," the "Proprietary information, scientific, clinical regulatory, etc." and the "Records", research, and development reports, clinical study reports and regulatory documents" twenty two (22) months after the effective date of the December 7, 2010 Agreement.

d. Although the facts required to establish that Merck, the Merck Netherlands Defendants and the Merck Employee Defendants delayed the delivery of Pop Test's ORG 34517 supply and the other ORG 34517 related items identified in paragraphs 48 and 49, above, with the intent to defraud Pop Test, are solely within the control of said Defendants, this intent can be reasonably inferred from the following facts obtained from the reading of the e-mails on the laptop computer:

50.     Pop Test was advised on September 15, 2010, prior to entering the December 7th Agreement, that Merck would provide  Pop Test with 25,000 active ORG 34517 capsules, 150 mg each; and 135,000 placebo capsules,  a copy of which is attached hereto as Exhibit 5 the contents of which are incorporated herein by reference;

51.     Peeters by E-Letter to Pop Test dated January 27, 2011, a copy of which is attached hereto as Exhibit 6 the contents of which are incorporated herein by reference, stated: "We will get about 24,000 capsules (the "stock" of ORG 34517). The price per 1,000 capsules is normally 883 U.S.D. but if we continue production and produce extra capsules, they will cost 1,000.00, 591 U.S.D. My proposal would be to order 10,000 extra capsules. This would cost you 5910 U.S.D;"

14

52.      Peeters, without the knowledge or consent of Pop Test provides a proprietary breast cancer study design to establish the effectiveness of ORG 34517 developed by Pop Test; Pop Test Cortisol's ORG 34517 API supply; and Pop Test's confidential trade secrets to Conzen in the absence of a non-disclosure agreement, see the E-correspondence dated June 14, 2011, a copy of which is attached hereto as Exhibit 7 the contents of which are incorporated herein by reference. Note: the E-letter expressly states, "we do not need a (sic) MTA". Yes they did!

a. An "MTA" is a Material Transfer Agreement. This is an agreement to transfer chemical material (drug active pharmaceutical ingredient) from an owner of a product to a collaborator for the purpose of doing a research project. An MTA is always used to legally and legitimately transfer and ship pharmaceutical ingredients and to establish a chain of custody of potentially dangerous chemicals.

b. In addition to an MTA, research universities have an Office of Sponsored Research that require faculty and company personnel designated by the entity that is the established owner of the compound to first sign a contractual agreement to allow the collaboration to commence. If new Intellectual Property comes out of said research, then the University's Office of Technology Transfer takes over the relationship to negotiate IP rights. Defendant Conzen, in her capacity as a University of Chicago Researcher, and as the daughter of the former Chairman and Chief Executive of the Schering-Plough Corporation knew the potential value of patents related to this compound, was well aware of these standard administrative requirements and chose to ignore them.

c. There was money to be made from the Pop Test technology***The University, Dr. Conzen, the Conzen lab could earn hundreds of millions of

dollars in research commission royalties for a successful new cancer drug***doing the <u>right</u> thing in this case was just too inconvenient.

53.      Peeters agrees to supply Conzen with additional samples of ORG 34517 for use in her breast cancer studies, see the E-correspondence string between Conzen and Peeters dated 06/14/2011, a copy of which is attached hereto as Exhibit 8 the contents of which are incorporated herein by reference and the E-correspondence string between Peeters and Conzen dated July 26, 2011, a copy of which is attached hereto as Exhibit 9 the contents of which are incorporated herein by reference;

54.      Peeters pursues a collaboration with Dr. Mark Giembycz University of Calgary to study the effects of ORG 34517, the  E-correspondence in which Dr. Giembycz contacts Peeters on June 17, 2011 at Merck and then Peeters forwarded his e-mail to his home e-mail address to pursue the relationship and the subsequent Publishing of the studies January 14, 2013 in which the Authors specifically thank Peeters (all without Pop Test's knowledge or consent):

   a. "We would like to thank Dr. Ard Peeters (Organon Laboratories, The Netherlands) for the kind gift of ORG 34517";

   b. The E-mail and study notation , a copy of which is attached hereto as Exhibit 10 the contents of which are incorporated herein by reference;

55.      Peeters and Defendant Henkjan Gellekink, who was both a Merck and Defendant Chardon employee, pursue a relationship with Professor Hermus to study the effects of ORG 34517 on Cushings disease, see the 08/24/2011 E-correspondence between Peeters and Sennef, a copy of which is attached hereto as Exhibit 11 the contents of which are incorporated herein by reference ; and

56.      Peters pursues a collaboration between Chardon and ACE Pharmaceuticals regarding ORG 34517, see the 08/29/2011 E-correspondence

between Peeters and Cees van Veldhuizen, a copy of which is attached hereto as Exhibit 12 the contents of which are incorporated herein by reference.

a. Merck, and their employees, including those identified as the Merck Employee Defendants and the Merck Netherlands Defendants, almost from the inception of the December 7, 2010 Agreement and on innumerable occasions, wrongfully, intentionally, fraudulently, and without authority therefore, refused to provide Plaintiff Pop Test the "stock", including ORG 34517 API, which under the December 7, 2010 Agreement was owned by Pop Test.

b. Merck instructed the Defendant University of Chicago that Pop Test's ORG 34517 API must NOT be returned to Pop Test, wrongfully claiming it had expired and instead must be destroyed, knowing full well that Pop Test OWNED IT and that the applicable FDA Guidelines allow the re-testing and validation of API beyond their administrative "expiration" date.

c. Merck on multiple occasions wrongfully, intentionally and fraudulently advised Peeters and Broekkamp not to send Pop Test the 100 grams, which was later determined to be 500 grams, of ORG 34517 API that was in their possession, even after Merck had been put on notice of their involvement in the conspiracy with Peeters and Broekkamp in the November 1, 2011 Letter, *see* Exhibit 2.

d. This ORG 34517 API has never been provided to Pop Test, and its whereabouts are unknown to present date.

e. Defendants Merck in their complicit refusal to provide Pop Test the "Stock" of ORG 34517, simply refused or ignored numerous requests, written and telephonic; or stated as bogus justification for its refusal that the ORG 34517 "Stock" had expired - What had expired was good faith, common decency and legality.

f.  Although the facts required to establish that Merck withheld Pop Test's
ORG 34517 "Stock," with the intent to defraud Pop Test are solely within
the control of said Defendants, this intent can be reasonably inferred from
the following facts:

57.     The assertions that the API "expired" was false, fraudulent, and
well known to be so to the Third largest pharmaceutical company in the world;

58.     Merck, on October 14, 2011, ten and one-half (10 ½) months
after the effective date of the December 7, 2010 Agreement, finally provided Pop
Test what was represented as a complete inventory list of Pop Test's ORG 34517
drug product (DP), and drug substance (DS) (the API),  a copy of which is attached
hereto as Exhibit 13 the contents of which are incorporated herein by reference;

59.     Pop Test learned 22 months after the effective date that Batch
AE, (the most recently produced) is 7033 grams - approximately 15 pounds, see
Exhibit 13 at page 3.

60.     Batch AE was re-tested for analysis, certification, and extension
of expiration date by Merck without Pop Tests' knowledge on November 26, 2010,
and on April 10, 2012, with a new expiration date of June, 2014 being assigned to
all on Batch AE, a copy of which is attached hereto as Exhibit 14 the contents of
which are incorporated herein by reference.

61.     Batch AE was the batch of ORG 34517 from which Merck and
Peeters provided Conzen and the other University Defendants API without Pop
Test's knowledge or consent.

62.     The "stock" referenced in the December 7, 2010 Agreement,
which has never been provided to Pop Test, also was made from Batch AE, see
Exhibit 14.

63.     The ORG 34517 API and stock was held and stored in Oss,
Netherlands (Organon), see Exhibit 14, and all direction and control of the ORG

34517 API and stock was under the control of Merck through its employees, including the Merck Employee Defendants, before and after the December 7th Agreement, even after Peeters' and Broekkamp's employment terminated at Merck, see the 06/17/2011 E-correspondence string between Peeters and van Rosmalen, a copy of which is attached hereto as Exhibit 15 the contents of which are incorporated herein by reference. Note: this string of e-correspondence demonstrated the illegal shipment of Pop Test's API to the Chicago Defendants; the 06/29/2011 E-correspondence string between Peeters and Organon employee Ferry Brands (who also was an employee of Chardon), a copy of which is attached hereto as Exhibit 16 the contents of which are incorporated herein by reference; the 07/08/2011 E-correspondence string between Peeters and Lieke van Hemert, a copy of which is attached hereto as Exhibit 17 the contents of which are incorporated herein by reference. Note: Defendant Peeters and Merck had shipped 500.9 grams of Pop Test's API to the University of Nijmegen without advising for whom and why. The University did not know why it was received or what it was. Defendant Peeters with the help of Defendant van Rosmalen converted 500.9 grams of Plaintiff's API. Interestingly it cost Plaintiff more than $10,000 to have 40 grams of API produced, making the stolen API by Defendant Peeters worth more than $100,000. The 08/24/2011 E-correspondence string between Peeters and Organon employee K.J. Booy, and other Merck employees in which Defendant Peeters tries to get other compounds from Merck stating they are for Pop Test. Note Peeters was no longer an employee of Merck at this time. A copy of which is attached hereto as Exhibit 18 the contents of which are incorporated herein by reference; the 09/07/2011 E-correspondence string between Peeters and Organon employee Jacques Schipper, a copy of which is attached hereto as Exhibit 19 the contents of which are incorporated herein by reference; and the 09/19/2011 E-correspondence string between Merck Organon employee Piet Verheijden (also a Chardon employee) and Peeters and

many other high level Merck executives. This string of e-mails demonstrates the "Keystone Cops" mentality of Defendant Merck at its best: Plaintiff contacts new transition officer Kevin Oliver at Merck in N.J. inquiring about the ORG 34517 stock with concerns as to its storage as the Organon facilities prepare to close. The e-mail is then sent by Oliver for a response from Head of Global Licensing in N.J. Meeta Chaterjee, who then requests a response from Merck Organon Licensing Executive Nico Stam, who then requests a response from Merck Organon employee Kees-Jan Booy, who requests a response from Merck Organon employee Piet Verheijden, who contacts ex-employee Defendant Peeters as to how to respond to Pop Test, a copy of which is attached hereto as Exhibit 20 the contents of which are incorporated herein by reference .

64.     Merck, even upon formal written notice to the chief executive officers and counsel of the company, provided NO assistance, constraints, cease and desist orders, actions, suits…anything…to anyone…concerning these incredibly serious failures in contract and ethical obligations, trade secrets, protocol, etc. as is its ethical obligations and under the December 7, 2010 Agreement.

65.     Merck and the Merck Defendants, therefore, were complicit in Pop Test's products, intellectual property, and know-how being wrongfully disseminated, not only to the University Defendants, see Exhibit 7, but also having been "shopped" by the Merck Netherlands Defendants to numerous learned institutions around the world, see Exhibit 3.

66.     Merck wrongfully, intentionally and fraudulently redacted from the confidential, proprietary investigational documents, all necessary references for the manufacturing of ORG 34517 to prevent Pop Test's ability from manufacturing the product pursuant to FDA Guidelines and to prevent Pop Test from developing and commercializing the product, thus making it impossible for Pop Test comply with its obligations under the December 7, 2010 Agreement.

20

67.     Merck wrongfully, intentionally, and fraudulently failed to provide to Pop Test the ORG 34517 capsules (150 mg each), the placebo, and the API.

68.     The refusal of Merck to supply the required "stock" and formula, and the inability of Pop Test to manufacture the drug, precluded Pop Test from being able to initiate the clinical studies referenced in the December 7, 2010 Agreement.

69.     Merck's wrongful, intentional and fraudulent refusal to provide "Stock" made it IMPOSSIBLE for Pop Test to conduct the necessary CNS studies required by the December 7, 2010 Agreement and to respond to Patent Office queries around the world, thus, threatening the validity of the assigned pending patents referenced in the December 7, 2010 Agreement.

70.     Disturbingly, the most important materials needed for Pop Test to develop and commercialize ORG 34517, including the formula to make the drug and the inventory, were not released on instruction from the Merck in house legal department in New Jersey.

71.     Merck, the Merck Employee Defendants and the Merck Netherlands Defendants conspired to wrongfully, intentionally, and fraudulently produce forged and plagiarized study results and protocol, thereby jeopardizing Pop Test's ability to perform its obligations under the December 7, 2010 Agreement and to succeed in its development and capitalization of ORG 34517.

72.     Merck wrongfully, intentionally, fraudulently, and without the authority, knowledge or consent of Pop Test, submitted false and misleading study reports regarding ORG 34517 to the FDA to willfully sabotage the drug and have it labeled as a teratogen.

73.     Furthermore, Pop Test learned on February 1, 2013, through its patent diligence/surveillance paradigm, that in July and August 2012, Pop Test's Philippines Counsel E.B. Astudillo & Associates mistakenly contacted Merck both

in the Netherlands and New Jersey in regard to a former Merck Patent application that was assigned to Pop Test in the December 7, 2010 Agreement.

74.     Merck instructed Pop Test's Philippines Counsel, without Pop Test's knowledge or consent, "Please note that this case has been abandoned, and please take no further action," rather than to ethically advise Pop Test's Philippines Counsel to contact Pop Test, the OWNER of the Patent application - the Patents were therefore "Merck'd for Death!"

75.     Merck, thereafter and after being put on actual notice of the conspiracy to defraud Pop Test, cancelled Pop Test's patent applications in Chile and Australia.

76.     Pop Test had performed all obligations above and beyond the requirements of the December 7, 2010 Agreement to the extent it was able to, in light of the actions of Merck, the Merck Employee Defendants and the Merck Netherlands Defendants.

77.     Pop Test, despite the outrageous, hubristic, complicit, conspiratorial, and damaging actions of the named and non-named conspirators, has expended substantial investment in funds, time and development costs to preserve and proceed in the development and capitalization of ORG 34517, only to be thwarted by the Merck's, and the other Defendants' intentional plan to steal, convert, destroy the property, both tangible and intangible, for which Pop Test had negotiated in good faith.

78.     The December 7, 2010 Agreement , required inter-alia, the following performances from Plaintiff Pop Test for the benefit of Merck:

a. Pop Test was to develop ORG 34517 as an Investigation of New Drug ("IND"), *see* Exhibit 1 at ¶ 3.1;

b. Pop Test was to provide Merck detailed "annual reports describing its process and commercializing ORG 34517," *see* Exhibit 1 at ¶ 3.2;

c.  Pop Test was to use good clinical, laboratory and manufacturing practice in development of ORG 34517, *see* Exhibit 1 at ¶ 3.3);

d.  Pop Test was to interface with the FDA on all regulatory developments of ORG 34517, *see* Exhibit 1 at ¶ 4.1 et seq.;

e.  Pop Test was required to "complete at least one clinical study…," *see* Exhibit 1 at ¶ 5.2 and Pop Test created such "Clinical Development Plan" dated January, 2011;

f.  Pop Test's, January, 2011 "Clinical Development Plan" is a detailed plan for the conduct of studies prepared by Pop Test, and presented only days after the execution of the December 7, 2010 Agreement, in which Pop Test intended to use the ORG 34517 "Stock" and know-how etc. which, was not received from Merck for 22 months, conveniently outside the period during which Merck was required to assist and support Pop Test, *see* Exhibit 1 at ¶¶ 4.1 (b) and (g);

g.  Plaintiff Pop Test was responsible for the manufacture of the ORG 34517 product, *see* Exhibit 1 at ¶ 6.1;

h.  Pop Test was to pay the Merck "Milestone Payments" based on attainment of the Development, regulatory and commercial milestones… the first of which was to be $500,000 from one year of the effective date of the contract ("best efforts"), *see* Exhibit 1 at ¶ 7.2;

i.  Pop Test was required to "prosecute, maintain and enforce all assigned patents…," *see* Exhibit 1 at ¶ 8.1), which was made IMPOSSIBLE by Merck and the named conspirators actions, and, thus Pop Test incurred substantial investment in time, labor, expenses, consumed resources in the development and the maintenance and prosecution of ORG 34517 related patents, which are valued at substantially more than the "milestone payment," without the ability to develop or commercialize ORG 34517.

79.     Pop Test was to advise Merck of any threatened infringement of the ORG 34517 related patents, see Exhibit 1 at ¶ 8.4, and was required to advise Merck of their "threatened infringement" activities; and

80.     Pop Test was required/forced to expend substantial funds to obtain insurance, see Exhibit 1 at ¶ 11.6, although at that time and beyond, there was NOTHING to insure.

81.     In what universe in which two commercial parties enter an agreement and in which one so completely violates its responsibilities and obligations, would the other pay $500,000 for the privilege of having its technology stolen?

## The Netherlands Merck Defendants

82.     Merck's "Transition Team" was comprised of the ORG 34517 lead scientist, Defendant Peeters, and the lead in-house IP attorney, Defendant Broekkamp, see Exhibit 2.

83.     Peeters' role as a transition team member was to, inter-alia, educate Pop Test on the scientific, clinical and manufacturing aspects of ORG 34517.

84.     Broekkamp's role was, inter-alia, to educate Pop Test on the intellectual property, both issued and pending throughout the world; and also to prepare, provide, and administer the formal, legal assignments of ownership to Pop Test of the ORG 34517 related patents and applications throughout the world.

85.     The transition paradigm was referenced in E-Correspondence, telephone communications, courier and mail communications, and in person.

86.     It was apparent to all parties, and agreed upon even before the signing of the December 7, 2010 Agreement, that the project would also benefit Dr.

24

Peeters and was permitted by Merck to consult with Pop Test on the non-transitional ORG 34517 development.

87.     Peeters and Broekkamp signed confidentiality agreements ("CDA") with Pop Test on October 12, 2010 and on March 2, 2011, respectively, under New Jersey law.

88.     Peeters told Pop Test in February, 2011 that his employment position with Merck would terminate on June 30, 2011.

89.     Pop Test was told by Merck that Defendant Peeters was free to perform pre-clinical trials at the University in Nijmegan, Netherlands for Pop Test.

90.     Peeters advised Plaintiff Pop Test that he had possession of one hundred grams of Pop Test's ORG 34517 API in his Organon/Merck lab (it was really the 500.9 grams referenced in ¶63 above) and was allowed to do pre-clinical studies for Pop Test consistent with the developmental paradigm of the December 7th Agreement.

91.     Pop Test, in May, 2011, as a supplicant, requested and completed a required Material Transfer Agreement ("MTA") for Merck to ship some of its ORG 34517 to a Pop Test research associate in Japan who was working on Pop Test's proprietary oncology research.

92.     Peeters intentionally delayed sending Pop Test's ORG 34517 API to Pop Test's research colleague for months.

93.     Pop Test, to facilitate the research and the resultant communication between Pop Test and Peeters, purchased a work computer, (the Apple laptop) to be used by Peeters to expedite and memorialize the activity he was doing on behalf of Pop Test.

94.     Pop Test entered a Work for Hire Agreement with Peeters and Chardon on June 7, 2011, which obliged Peeters/Chardon to perform three (3) pre-clinical ORG 34517 studies, see the 06/07/2011 Work for Hire Agreement , a copy

of which is attached hereto as Exhibit 21 the contents of which are incorporated herein by reference .

95.     Peeters, after being told by Pop Test that it was preparing a unique and confidential pre-clinical study for a Pop Test proprietary ORG 34517 oncology treatment, informed Pop Test that he could obtain through an unidentified "colleague", breast cancer cells that he would use to conduct Pop Test's proprietary ORG 34517 pre-clinical oncology study in The Netherlands.

96.     The June 7, 2011 Work for Hire Agreement was, therefore, on June 17 amended to substitute Pop Test's proprietary breast cancer study for one of the other three studies identified in the June 7, 2011 Work for Hire Agreement, a copy of which is attached hereto as Exhibit 22 the contents of which are incorporated herein by reference.

97.     Peeters in August, 2011, sent to Pop Test a summary of "his" successful breast cancer study that he allegedly conducted in The Netherlands, see 08/25/2011 the E-correspondence string between   Peeters and Broekkamp, a copy of which is attached hereto as Exhibit 23 the contents of which are incorporated herein by reference.  Note: this correspondence demonstrates the conspiracy of Defendants Peeters and Broekkamp at a time that their inter-relationships (including Chardon) was unknown to Pop Test.

98.     Peeters, on August 27, 2011 unexpectedly and abruptly resigned from any further involvement with Pop Test.

99.     Pop Test repeatedly contacted Peeters to provide the complete report, results and protocol of the proprietary breast cancer study he allegedly conducted in The "Netherlands" but Peeters refused to provide any further results or the protocol.

100.     Pop Test contacted Broekkamp, who was then acting as Pop Test's foreign IP counsel, see the 07/08/2011 E-correspondence string between

Broekkamp and Pop Test, a copy of which is attached hereto as Exhibit 24 the contents of which are incorporated herein by reference, and told him of Peeters' termination of his association with Pop Test and asked Broekkamp to assist it in obtaining the return of a Pop Test full report from Pop Test's proprietary breast cancer study, the remaining supply of Pop Test's ORG 34517 API and all files relevant thereto, and the work computer Pop Test provided to Peeters.

101.    Broekkamp eventually arranged for Pop Test to receive the full report and protocol from its proprietary breast cancer study, which allegedly had been conducted by Peeters in the Netherlands, but in fact contained data from studies conducted by Conzen.  See 08/30/2011 E-correspondence string between Conzen and Peeters, a copy of which is attached hereto as Exhibit 25 the contents of which are incorporated herein by reference; the 08/30/2011 E-correspondence between Conzen and Peeters , a copy of which is attached hereto as Exhibit 26 the contents of which are incorporated herein by reference; and the 09/06/2011 E-correspondence string between Broekkamp and, a copy of which is attached hereto as Exhibit 27 the contents of which are incorporated herein by reference. Note: This string of e-mails shows the complicit interchange between Defendants Peeters and Broekkamp with respect to Pop Test.

102.    Broekkamp also facilitated the return of Plaintiff's Apple computer after numerous inquiries by Pop Test, which was returned to Plaintiff's New Jersey office on October 24, 2011; however, the remainder of Pop Test's ORG 34517 API in Peeters' possession was never returned to Plaintiff.

103.    Pop Test, on October 25, 2011, issued a global press release, based on the full report it received from the Merck Netherlands Defendants, publicizing "its" successful cancer study, which allegedly was conducted by Peeters in the Netherlands (but had actually been conducted by Conzen in Chicago) to promote the company.

104.     Pop Test had the data from the work computer it had provided Peeters translated from Dutch into English.

105.     Pop Test was stunned and dismayed to learn from reading the translated contents of Peeters' work computer on October 28 and 29, 2011, that the Merck Netherlands Defendants, including Peeters, Broekkamp and Chardon, had conspired with Merck, the Merck Employee Defendants, and the University of Chicago Defendants, including Conzen and the Conzen Lab, with the intent to convert Pop Test's stock of ORG 34517 and to misappropriate Pop Test's confidential and proprietary ORG 34517 technology and regulatory documents, including but not limited to Pop Test's proprietary breast cancer study.

106.     Pop Test learned from the data translated from its Apple computer loaned to Peeters', that its proprietary breast cancer study had been conducted by Conzen in Chicago and the content of the reports it had received from Peeters had in fact been forged and plagiarized from Conzen's study, a copy of which is attached hereto as Exhibit 28 the contents of which are incorporated herein by reference.

107.     The conspirators included Merck, which without Pop Test's knowledge and consent and without a legally required and necessary Material Transfer Agreement, supplied to Dr. Conzen's lab Pop Test's ORG 34517 API, know-how, clinical studies, and other trade secrets.  See Exhibit 2.

108.     Although the facts required to establish that Merck, the Merck Netherlands Defendants, the Merck Employee Defendants and the University of Chicago Defendants acted with the intent to defraud Pop Test of its rights in ORG 34517 are solely within the control of said Defendants, this intent can be reasonably inferred from the following facts.

109.     On or before May 26, 2011, Defendant Conzen at the University of Chicago requested from Dr. Michael Chisamore, a Chicago Merck employee, a

quantity of compound ORG 222189 be sent to her University of Chicago lab for her breast cancer experiments, see the 06/14/2011 E-correspondence string between Conzen and Peeters a copy of which is attached hereto as Exhibit 29 the contents of which are incorporated herein by reference.

110.    On or before May 26, 2011, Merck's Dr. Chisamore had contacted Defendant Ard Peeters, (who was then also a Merck/Organon employee), concerning Dr. Conzen's request and arranged a communication between both.

111.    During a conversation on June 14, 2011, Defendant Peeters discussed with Dr. Conzen the superior properties of ORG 34517 over 222189 and subsequently provided Dr. Conzen, without Pop Test's knowledge or consent, with Plaintiff's CONFIDENTIAL material, know-how, trade secrets, clinical study design and intellectual property information, data and study protocols for ORG 34517, including a highly confidential ORG 34517 Investigation Brochure, *see* Exhibit 7, containing all of the CONFIDENTIAL clinical reports and data created by Organon, not only on ORG 34517 but also a vast clinical study compilation on RU486 (Mifepristone) too, which Pop Test only was given access to during its ORG 34517 due diligence, and after signing a confidentiality agreement.

112.    Peeters, on June 14, 2011, also told Conzen that he would be leaving the employ of Merck on July 1, 2011 and should contact him at his personal e-mail address, but Conzen did not request the contact information for his replacement at Merck and at no time did Peeters suggest that Dr. Conzen remain in contact with Merck employees even though Conzen was aware that the requested ORG 34517 was to be shipped to her lab by Merck after his termination, *see* Exhibit 7.

113.    Peeters, without Pop Test's knowledge or consent, also arranged for ORG 34517 compound to be sent by Merck to Conzen on or about June 14, 2011 and told Conzen "we do not need an MTA," *see* Exhibit 7. Note: This interchange

would have been to an ethical scientist a red flag causing significantly more inquiry as to the legality of these transactions.

114.     Peeters, throughout the period from June through November, 2011, collaborated with, guided, advised, instructed and provided Conzen and the Conzen Lab with Pop Test's proprietary intellectual property, so that Conzen and the Conzen Lab could conduct Pop Test's proprietary breast cancer study;

115.     Peeters, during the June through November, 2011 period, collaborated with Conzen and the other University of Chicago  Defendants who worked in the Conzen Lab, on an abstract entitled Glucocorticoid Receptor Antagonism As Novel For Breast Cancer to be published in the abstracts for the American Association for Cancer Research Conference (AACR) in March, 2012, *see* the 10/24/11 E-correspondence between and Conzen and Peeters, a copy of which is attached hereto as Exhibit 30 the contents of which are incorporated herein by reference;

116.     Additionally during the June through November 2011 period Conzen and her associates, including but not limited to Heather S. Walsh, and Katarzyna (Katie) Gut failed to put Material Transfer Agreements and confidentiality agreements in place after Peeters and the other Merck Netherlands Defendants and Merck Employee Defendants had transferred the ORG 34517 to Conzen. *see* the 10/7/2011 E-correspondence string between Conzen and Peeters, a copy of which is attached hereto as Exhibit 31 the contents of which are incorporated herein by reference; the 10/10/2011 E-correspondence string between Walsh and Peeters, a copy of which is attached hereto as Exhibit 32 the contents of which are incorporated herein by reference; the 10/12/2011 E-correspondence string between Gut and Peeters, a copy of which is attached hereto as Exhibit 33 the contents of which are incorporated herein by reference; the 10/19/2011 E-correspondence string between Gut and Peeters, a copy of which is attached hereto as Exhibit 34 the

contents of which are incorporated herein by reference; the 10/19/2011 E-correspondence string between Conzen and Peeters, a copy of which is attached hereto as Exhibit 35 the contents of which are incorporated herein by reference; the 10/21/2011 E-correspondence between Peeters and Gut, a copy of which is attached hereto as Exhibit 36 the contents of which are incorporated herein by reference; the 10/21/2011 E-correspondence between Gut and Peeters, a copy of which is attached hereto as Exhibit 37 the contents of which are incorporated herein by reference; and the 10/24/2011 E-correspondence string between Gut and Peeters, a copy of which is attached hereto as Exhibit 38 the contents of which are incorporated herein by reference;

117.    Defendant Conzen advised Defendant Peeters on August 17, 2011 of the success of the ORG 34517 study, a copy of which is attached hereto as Exhibit 39 the contents of which are incorporated herein by reference; and on August 18, 2011, Merck's Dr. Michael Chisamore visited Dr. Conzen's lab for an update on the "Merck" studies. A copy of which is attached hereto as Exhibit 40 the contents of which are incorporated herein by reference. Curiously, (badge of fraud) Dr. Conzen noted in an e-mail to Defendant Peeters, "I said (only)…told Chisamore nothing about ORG 34517, but "only" updated on ORG222189.

118.    September 23, 2011, Defendant Peeters expressed concerns to Dr. Conzen about protecting the intellectual property from the breast cancer study, (a study for which Defendant Peeters had been contracted to perform for Pop Test). Dr. Conzen stated that she will take care of their patent filings, a copy of which is attached hereto as Exhibit 41 the contents of which are incorporated herein by reference.

119.    September 29, 2011, Dr. Conzen confirmed to Defendant Peeters that patents have been filed for the breast cancer treatment reflecting the ORG 34517 study and know-how learned, thereby violating Pop Test's contract referenced above

with Defendant, Peeters and Chardon Pharma, a copy of which is attached hereto as Exhibit 42 the contents of which are incorporated herein by reference.

120.     September 30, 2011, Defendant Dr. Conzen curiously discussed with Defendant Peeters to make a "loose" agreement amongst themselves, regarding the ORG 34517 project, a copy of which is attached hereto as Exhibit 43 the contents of which are incorporated herein by reference.

121.     September 30 and October 7, 2011, Defendant University of Chicago's Heather Walsh showed appropriate concern about the lack of procedural documents (CDA and MTA) that she (and Dr. Conzen) knew were required by the University of Chicago, and attempted to put them in place with Defendant Peeters after the fact, a copy of which is attached hereto as Exhibit 44 the contents of which are incorporated herein by reference.

122.     October 1 and 7, 2011, Defendant Peeters and Dr. Conzen set up collaborative studies protocol moving forward with studies using Pop Test's ORG 34517, a copy of which is attached hereto as Exhibit 45 the contents of which are incorporated herein by reference.

123.     October 10, 2011, Heather Walsh, Defendant Conzen, Defendant Peeters, Defendant Broekkamp discussed collaborative Agreements and Material Transfer Agreement (MTA), a copy of which is attached hereto as Exhibit 46 the contents of which are incorporated herein by reference. (Note: the ORG 34517 compound owned by Pop Test was sent without Pop Test's knowledge or consent, and was sent by Organon/Merck employee and Defendant Beata Van Rosmalen, not by Defendant Peeters, not Defendant Chardon Pharma, and same was received by Defendant Conzen's Lab on July 13, 2011.

124.     October 19, 2011, Dr. Conzen and University of Chicago's Denise Butler and Katie Gut attempted to cover their tracks as to the use of ORG 34517, again after the fact, by trying to put in place a CDA and MTA with Defendant

32

Peeters, which should have been under the law in place before the compound was ever sent to them, a copy of which is attached hereto as Exhibit 47 the contents of which are incorporated herein by reference.

125.     October 20, 2011, Dr. Conzen's associate Maxwell Skor sent Defendant Peeters the draft of an abstract University of Chicago intended to publish at the 2012 conference of the American Association of Cancer Research (AACR). (See (f) above), memorializing their collaboration, a copy of which is attached hereto as Exhibit 48 the contents of which are incorporated herein by reference.

126.     October 21, 2011, e-mail trail between University of Chicago Katie Gut, Heather Walsh, Defendant Conzen, and Defendants Peeters and Rik Broekkamp, Esq. (Organon/Merck Lead IP Counsel) regarding "preparing a contract for the collaboration with Suzanne" which clearly, fraudulently deflects the predicate, namely the absence of an MTA. Parenthetically, Merck Attorney Defendant Rik Broekkamp was employed by Organon/ Merck until November 1, 2011, a copy of which is attached hereto as Exhibit 49 the contents of which are incorporated herein by reference.

127.     October 24, 2011 shows an e-mail trail between Dr. Conzen, Defendant Peeters and University of Chicago's Maxwell Skor in which they agreed to delete all references to ORG 34517 from the abstract to be submitted to the AACR. Note here: the "nice" abstract based on the "very nice data…" as per Defendant Conzen, was in fact Pop Test's study, converted by Defendants Peeters, Broekkamp and Chardon, and thereafter the University of Chicago/Conzen/Conzen lab Defendants, a copy of which is attached hereto as Exhibit 50 the contents of which are incorporated herein by reference. Also Note: Peeters seemingly inexplicably withdraws reference to ORG 34517 from the Abstract to be published on the study. Why? Because that would be publishing evidence that they had stolen Plaintiffs technology. The patent that University of Chicago obtained based upon

33

this study deliberately modified its claims to only focus on Mifepristone (RU486) even after it was already allowed in the broader claim to cover more. It similarly failed to reference the underlying Pop Test technology which would render the patent forfeit.

128.    The portfolio shows at least 29 E-Correspondences involving Defendants Broekkamp and Peeters complicity (conspiracy). For example, see Outline in Portfolio ## 2, 3, 16, 17, 21, 34, 43, 44, 47, 48, 50, 54, 55, 59, 61, 66, 67,68,69,72,73,78,90,92,96,97,98,99, and the damning # 100.

129.    These are explicit Defendants Peeters, Broekkamp, Conzen and Chardon entries…their communication, words, action and conspiracy as stated in their own writings.

## The University Defendants

130.    As stated above Defendants University of Chicago / Conzen / Conzen Laboratory / Employees on or before 2010 were involved in cancer research involving RU 486 Mifepristone (abortion drug).

131.    Merck and employees that included Dr. Michael Chisamore of Merck's Chicago offices, had been historically involved in many of the Defendant University of Chicago's research projects, including the providing to the University of Chicago the Merck/Organon Drug ORG222189 in 2010, and in the person of Defendant Suzanne D. Conzen, M.D, *see* Exhibit 8.

132.    Dr. Chisamore and Defendant Peeters (employees of Merck) provided Defendants University of Chicago, Conzen, Deng, and Kocherginsky with ORG 34517, the more potent, more targeted drug for their research, and for "better results" in 2011, AFTER ORG 34517 was sold to Plaintiff, and without Plaintiff's knowledge or consent.

133.     In June, 2011, Defendant Peeters, while still an employee of Merck/Organon (and transition team member) requested employee, Defendant Beata Van Rosmalen at Merck/Organon, ship Plaintiff's ORG 34517 drug substance to Defendants University of Chicago/Conzen/Conzen Laboratory, which submission included all of Plaintiff's highly confidential and obviously proprietary IP, clinical data, Investigative Brochure, know-how, clinical studies, confidential materials/information, and the Pop Test clinical study design for oncology created and designed by Plaintiff's scientists for its ORG 34517 drug/development; again, without Plaintiff's knowledge or consent, *see* Exhibit 8.

134.     Plaintiff's proprietary information referenced above included multi-millions of dollars' worth of testing data and research on Organon's ORG 34517 and Roussel Competitor's RU486 (Mifepristone) drug studies which kick-started the revised and illegal Conzen Laboratory studies leading to the illegal issuance of a Patent based on the Plaintiff's technology and research data. Note: It was the knowledge stolen from Pop Test that enabled the University of Chicago Defendants to overcome the "rejections" from the USPTO.

135.     Defendant Beata van Rosmalen, Merck's Organon materials coordinator was complicit and responsible for this and various other shipments of Plaintiff's products in furtherance of the conspiracy, and without Plaintiff's knowledge or consent, a copy of which is attached hereto as Exhibit 51 the contents of which are incorporated herein by reference.

136.     Said Defendant wrongfully shipped the product without the legally required MTA's to various places in the world including the University of Chicago in Chicago and The University of Nijmegan in the Netherlands, the latter being unaware of why or how they received it, a copy of which is attached hereto as Exhibit 52 the contents of which are incorporated herein by reference.

137.     As stated above, The Merck Netherlands Defendants were retained on June 7 and 17, 2011, by Works for Hire Agreements as agents of Plaintiff to conduct Plaintiff's confidential and proprietary pre-clinical cancer study by the said Works for Hire Agreements signed by the Defendants, which the parties understood would be conducted in the Netherlands, *see* Exhibits 21 and 22.

138.     The Merck Netherlands Defendants, with Defendant Peeters (Merck's lead ORG 34517 scientist/transitional team member) as a participatory clinician, took the said Plaintiff's proprietary and confidential oncology study and design to Defendants University of Chicago/Conzen/Conzen Lab and the study was conducted in Chicago at the University of Chicago (not the Netherlands as fraudulently advised).

139.     The result was a fraudulent, plagiarized study/report/documents, which were the intellectual property of and paid for by Plaintiff.

140.     Also stated earlier, Defendant Broekkamp was at once a Merck Attorney in their in-house legal department (also a transition team member), and a surreptitious member/owner/employee of Defendant Chardon Pharma, the vehicle by which the Merck Netherlands Defendants intended to and did convert valuable, confidential property from Plaintiff, as outlined in the Chardon Pharma corporate structure chart, a copy of which is attached hereto as Exhibit 53 the contents of which are incorporated herein by reference .

141.     As stated earlier, Defendant Peeters advised Defendants University of Chicago/Conzen that he was terminating his employment at Merck on July 1, 2011.

142.     The University of Chicago/Conzen Defendants continued their relationship with the Merck Netherlands Defendants (in part/at certain times, as employees of Merck or as former employees).

36

143.    The University of Chicago/Conzen Defendants did not, as would be reasonably appropriate, to inquire of Merck as to the replacement of Defendant Peeters and as to their studies on or after July 1, 2011, and/or as to the ownership of ORG 34517, which was the property of Plaintiff since December 7, 2010 and as shown in the filed Assignment of Patents at the United States Patent and Trademark Office (USPTO).

144.    During the period of June, July, August, September, and October, 2011, the Merck Netherlands Defendants collaborated, directed and participated in the studies at Defendants University of Chicago/Conzen Lab/Conzen (Plaintiff's technology), and said Defendants collectively did so surreptitiously including as to the articulation of patent application(s) on the ORG 34517 drug (Plaintiff's drug), and the creation of studies, reports and publication(s) to be supplied to noted Oncology Conferences in the United States.

145.    In Mid-August, 2011, Defendant Peeters, after refusing to respond, finally reported to Plaintiff on the "Work for Hire" oncology project/tests and the "success of the study". Plaintiff questioned Defendant Peeters concerning the study and its delivery date, who thereupon inexplicably "quit" and refused to provide a complete study report, protocol, the technology and the Plaintiff's computer that contained Plaintiff's research, which was used for the tests.

146.    Only after a series of demands and threats of legal action, including as to the Attorney Defendant Broekkamp, did the Merck Netherlands Defendants supply the complete study report, protocol of Plaintiff's study that was ostensibly performed in the Netherlands. The computer was not included. Note: the computer revealed that the "study report" and protocol provided by the Merck Netherlands Defendants was a forgery produced only for submission to Plaintiff which carefully redacted and orchestrated any reference to the University of Chicago/Conzen/Conzen Lab, and inserted all Netherlands University/labs

references- clear badges of fraud! A copy of the report is attached hereto as Exhibit 54 the contents of which are incorporated herein by reference.

147.     Only after more such threats of legal action did the Netherlands Defendants forward to Plaintiff on October 24, 2011, the computer with its voluminous contents mostly in the Dutch language, and the keys to the bowels of the conspiracy.

148.     What before appeared as stupidity and inexplicable reticence became clear; the disclosure in the Defendants' own words of the existence and awful scope of the conspiracy unlocked when the contents of the computer was translated on or about October 28, 2011 into English.

149.     The Computer disclosed that the Plaintiff's Work For Hire Contract(s) for the oncology pre-clinical study to be performed in the Netherlands was in fact performed in Chicago at the Defendants University of Chicago/Conzen Labs and by the Defendants University of Chicago employees/Conzen; that the project included future studies on Plaintiff's drug; a continuing relationship and collaboration among the co-joined conspirator Defendants, the commercialization, development and products for ORG 34517, and without any reference to the primary important point; Plaintiff OWNED ORG 34517!

150.     As stated above, Plaintiff owned the drug since December 7, 2010; the patent ownership assignments to Pop Test from Merck to Pop Test for ORG 34517 were recorded and constituted legal notice in the United States Patent Office on April 8, 2011; Defendant Broekkamp as Merck patent transitional Counsel had recorded the patent ownership assignments in all countries throughout the world where Merck had foreign patents filed for the drug(s).

151.     Defendants University of Chicago/Conzen/Conzen Lab either knew of the ownership of ORG 34517 by Plaintiff, or failed to perform the sine qua

non standard diligence/inquiry before spending substantial sums of money including National Institute of Health and other research funds on the study.

152.     Plaintiff's product, know-how, technology, IP, clinical data, protocols, etc. were received into Defendants University of Chicago/ Conzen laboratory from numerous and incongruous sources which in customary and standard operating procedures, and good laboratory practice would have required inquiry at several levels of governance by a learned and renowned institution such as Defendant University of Chicago, and Defendant Conzen Lab and Defendant Conzen as director of her laboratory; and also the institutional employees and officers responsible for responding to governmental entities, and Plaintiff's initial inquiries, then entreaties in the matter.

153.     The string of hundreds of E-Correspondence in the Portfolio/Outline of Defendant's E-Mail Correspondence show that the Merck Netherlands Defendants orchestrated the medical breakthroughs of Plaintiff's designed proprietary pre-clinical study, with either no due diligence by Defendants University of Chicago/Conzen, and/or absolute complicity.

154.     The complicity/conspiracy is however demonstrated by the substantial correspondence referenced in the E-Mail Portfolio and behaviors during the study and after, such as on August 18, 2011 in which Defendant Conzen reported her excitement as to the superior results with ORG 34517 over ORG222189 and RU486, and her decision not to provide Dr. Chisamore/Merck with the results of the ORG 34517 superiority. *See* Exhibit 40. This is especially so when considering Merck ostensibly owned the drug, and Defendants University of Chicago/Conzen/Conzen Labs were performing a study along with Merck's employees Chisamore, Peeters and Broekkamp.

155.     Similarly, the regulations of most nations legally require, and it is standard operating procedure, for research/pharmaceutical organizations to use

Material Transfer Agreements (MTA) prior to shipping any drug substance (especially internationally).

156.    The standard Organon (Merck) MTA form which, by way of example is one that was used by Organon to ship ORG 34517 to another University, a copy of which is attached hereto as Exhibit 55 the contents of which are incorporated herein by reference.

157.    The Organon MTA specifically provides:

a. The clearly and oft-stated "confidentiality" of the information and product referenced in the MTA

b. The specific limitation for the shipment "for the future purpose of evaluation by Institution (who) accepts such disclosure and transfer on the terms set out herein".

c. "The material will only be used for the purpose as specified *** will not be used for commercial purposes such as production for sale, for which a commercialization license may be required".

d. "The Material is considered proprietary to Organon". "Institution…agrees to…make no attempt to elucidate the structure of the Material and…not to transfer the Material to other people…".

e. "All results, inventions, trade secrets, know-how, and other rights associated therewith, whether patentable or not, arising out of or in connection with the performance of the Project…shall be the property of Organon…".

f. "All results and information derived from the Project…will be kept secret and confidential…not used by…nor disclosed by Installation to any third party…".

g. Publication of "ORG 34517- related results" is to be based on submission and approval" (by Organon).

158.    These representations would clearly enure to the benefit and interest as the owner of ORG 34517- which is Plaintiff Pop Test!

159.    On information and belief, the historic submissions by Merck to the University of Chicago and the Conzen Laboratory for studies, including those managed by Dr. Michael Chisamore for Merck in Chicago, used the Merck form of proprietary MTA forms for the shipments of drug substances, etc. including on January 6, 2011, a copy of which is attached hereto as Exhibit 56 the contents of which are incorporated herein by reference In said correspondence relating to ORG 222189, on January 6, 2011, a Merck employee advised University of Chicago "I will send out the MTA by close of business today" (SOP).

160.    In the E-Mail trail as above noted in Portfolio/Outline, *see* Exhibit 3, are some examples of "complicity" (Venality) rather than stupidity:

a.  January 6, 2011, SOP utilized, and MTA is directed by Merck and University of Chicago for the transfer of ORG222189.

b.  June 14, 2011, SOP ignored by Defendants Peeters and Conzen with regard to ORG 34517 stated by Peeters, "for ORG 34517 we do not need a (sic) MTA", while Defendant Peeters was still an employee of Merck.

c.  All of the Defendants knew that the ORG 34517 drug substance was being shipped by Merck, not Defendant Peeters personally, nor from Defendant Chardon Pharma. *See* Exhibit 51 is a copy of June 17, 2011 Shipment Manifest/Instruction concerning shipment of Plaintiff's ORG 34517 drug by Merck to Defendant University of Chicago and Defendant Conzen. Same was without any notice to Plaintiff nor with its consent.

d.  Defendant Peeters also advised on June 14, 2011, that he was leaving the employ of Merck on July 1, 2011 and provided Defendant Conzen with his personal E-Mail address (no inquiry as to his replacement- as stated above).

e. July 26, 2011 E-mail from Defendant Peeters to Defendant Conzen with an attachment of a letter dated July 22, 2011 (after Defendant Peeters is no longer a Merck employee), providing Defendant Conzen, "my (Peeters') willingness to supply ORG 34517 to your laboratory for your abstract entitled 'Glucocorticoid receptor-specific antagonist: A novel therapy for estrogen receptor-negative breast cancer". (Note: This study IS the Pop Test Proprietary and designed study, The Merck Netherlands Defendants contracted to perform in the Netherlands for Plaintiff).

161.    Defendants University of Chicago/Conzen/Conzen Lab here clearly violated the protocols, SOP and requirements for an MTA; Defendant Peeters clearly had NO authority to grant dispensations from the legalities for the use of an MTA; Defendant Peeters was at 7/22/11 no longer an employee of Merck; at said moment, Defendants Peeters and Conzen were disregarding the ostensible "owner" of ORG 34517 i.e. Merck (not to mention Plaintiff); and HOW was Defendant Peeters to obtain, ship and control ORG 34517 after July 1, 2011?

162.    In Exhibits 41-45 the E-Mail trails contain dialogue between the Defendants Peeters and Conzen and their collaboration concerning their illegal/illicit filing of patents for the study findings, "we have to ensure that the findings are protected *** the patent was filed claiming the use of GR antagonism in breast cancer" (in violation of MTA, confidentiality agreements, and the Work For Hire Agreements). Defendant Conzen in her E-Mail of 9/30/11 stated, after the studies were completed that she wants, "some sort of loose agreement in place that acknowledges the transfer of the 345 (ORG 34517) to our lab", referencing acknowledgment that an MTA was required, and attempting/conspiring to nunc pro tunc a "loose" one.

163.    Parenthetically,    the    Defendants    University    of Chicago/Conzen/Conzen Laboratory had its own MTA form, which was, in the said

string of E-Mails in the Exhibit 3 Portfolio/Outline, sent to the Merck Netherlands Defendants, and ignored, The University of Chicago "Simple MTA Form" was sent to the Merck Netherlands Defendants by Katie Gut on October 12, 2011, long after completion of the study, stating Defendant University of Chicago is "attaching an MTA template that we propose to use to cover the transfer of ORG 34517", a copy of which is attached hereto as Exhibit 57 the contents of which are incorporated herein by reference.

164.    Exhibit 57 (University of Chicago MTA) acknowledges, <u>inter-alia</u>:

a. The material "is the property of the provider…"

b. "The material will be used for teaching or not for profit research purposes only"

c. The material "will not be distributed to others without the provider's written consent".

165.    All Defendants, as well as Dr. Michael Chisamore and Merck, knew an MTA was required, and all ignored and/or avoided its implementation and content.

166.    The filing of Patents by Defendants   University of Chicago/Conzen/Conzen Laboratory violated confidentiality, Confidentiality Agreements executed by several of the Defendants, the terms of the unsigned University of Chicago and Organon MTA forms, and Plaintiff's Work for Hire Agreements signed by the Merck Netherlands Defendants. ORG 34517 was sent and received for "research purposes only". Months later a patent issued incorporating Plaintiff's technology and its designed oncology study performed illicitly by Defendants University of Chicago/Conzen/Conzen Laboratory, the Merck Netherlands Defendants, and Merck who shipped the ORG 34517 drug to the

Defendants University of Chicago/Conzen/Conzen Laboratory more than 7 months after selling ORG 34517 to Plaintiff.

167.     Plaintiff's intellectual property was wrongfully used by Defendants University of Chicago/Conzen/Conzen Laboratory and contained in their Patent application and professional publications. Their similarity to Plaintiff's stolen intellectual property commands the inference that the one was copied from the other. [Note: again the ORG 34517 compound was sent by Merck and its Defendants employees to Defendants University of Chicago/Conzen/Conzen Laboratory, but refused, to the Plaintiff who was the actual owner thereof].

168.     Plaintiff has joined as additional Defendants in this action the Defendants University of Chicago, Dr. Suzanne D. Conzen, Pan Deng, and Masha Kocherginsky. The latter two Defendants are named as Defendants herein as the named "Co-inventors" under University of Chicago Patent Application # 13/071, 363, which was amended to include the willfully unnamed co-inventor Plaintiff Pop Test's stolen/converted/plagiarized clinical study, know-how, technology for the breast cancer therapy. Said Defendants have continued to date to prosecute unlawful patent applications using the Plaintiff's technology although in writing advised/noticed to cease and desist therefrom. Same is clearly "deceptive intent" and inequitable conduct as defined in 35 U.S.C. Section 256.

169.     When the United States Patent Office issued to the Defendant University of Chicago on August 8, 2013, its Notices of Allowance of patent grant, the Defendants University of Chicago/Conzen Lab/Conzen inexplicably amended their already allowed patent claims to remove any reference in the Patent Claim of ORG 34517 or any like-drugs, instead leaving only RU486 Mifepristone, in its final issued Patent. This amendment attempted to erase the un-erasable. Quere- why would any ethical enterprise deliberately narrow the scope of their already "allowed" Patent Claim? The reason is to (a) hide the conspiracy and (b) hide Pop Test's

technology and involvement. Failure to name Pop Test as an inventor in the Patent Application invalidates the Patent, and willfully (prior knowledge) is malpractice.

170.     On November 27, 2011 Plaintiff placed Defendant University of Chicago on actual and written notice of Plaintiff's ownership of ORG 34517 and the University of Chicago Defendant's obligation to cease and desist from appropriating Plaintiff's technology, a copy of which is attached hereto as Exhibit 58 the contents of which are incorporated herein by reference.

171.     Plaintiff again noticed Defendant University of Chicago in a letter dated March 22, 2013 outlining in detail the facts/information referenced in pleadings, and requesting cessation and communication concerning same, a copy of which is attached hereto as Exhibit 59 the contents of which are incorporated herein by reference.

172.     In said letter the "behavior" of Defendants University of Chicago, Conzen, Conzen Lab, Deng, and Kocherginsky was presented and the issue of the illicit use of Plaintiff's technology in the Patent for inter-alia "non-research" "commercialization" purposes, was more fully addressed.

173.     Pages 7 and 8 of Exhibit 59, Paragraph III outlines in detail Plaintiff's reasoning for the demand for the withdrawal of Defendants University of Chicago/Conzen Laboratory patent.

174.     Subsequent correspondence regarding the matter from said Defendants was either dismissive or ignored, therefore compelling the filing of this lawsuit.

175.     As stated above (and Exhibit 2), the letter from Plaintiff's Counsel to Merck dated 11/1/11 provided written notice of the conspiracy, the theft and the breaches of conduct and contract caused by Merck, their Defendants employees, agents, and co-conspirators, which include the Defendants     University of Chicago/Conzen/Conzen Laboratory, and others.

176.     The University of Chicago/Conzen Defendants and their agents intentionally and with actual notice of Plaintiff's inventorship, drafted, filed and received Patents/Applied for that included Plaintiff's proprietary technology, with deceptive intent failed to list Plaintiff as an inventor, said inequitable conduct being so egregious as to render their Patent(s) unenforceable.

**Corcept Therapeutics Inc.**

177.     Defendants University of Chicago, as aforesaid, continued their illegal actions in developing, patenting and commercializing Patents received using Plaintiff's converted research, technologies and know-how, and has applied for additional patents using Plaintiff's IP.

178.     A Press Release dated December 12, 2013 published by Corcept Therapeutics Incorporated announcing a licensing agreement between Corcept and the Defendant University of Chicago, a copy of which is attached hereto as Exhibit 60 the contents of which are incorporated herein by reference.

179.     On January 27, 2014 Plaintiff's Counsel because of the Press Release, forwarded a letter to the President of Corcept, a copy of which is attached hereto as Exhibit 61 the contents of which are incorporated herein by reference. Said letter outlined in full detail the illegality of the Patent, which Corcept had licensed, and Plaintiff's interest therein, that Defendant University of Chicago converted Plaintiff's technology, that Corcept cease and desist the illegal license and that the Patent was forfeit under 35 U.S.C. Section 256.

180.     Corcept has not advised that it will or did so cease and desist, and Plaintiff may be compelled to make Corcept a Defendant herein and to obtain all legal and equitable relief attendant thereto.

**Merck's Filing Of The False/Failed 2004 Study With The FDA**

181.     This Complaint outlined <u>inter alia</u> most of Merck's breaches of the December 7, 2010 Contract. Merck refused to provide Plaintiff the Active Pharmaceutical Ingredient (API)…advising "make your own". Cynically Merck 'redacted all necessary references for the manufacturing of ORG 34517 to prevent Pop Test's ability to manufacture the product pursuant to FDA Guidelines…".

182.     Merck data room, "Chemistry, Manufacturing and Controls Section…" cover sheet and redaction reference which shows the formula/synthesis purchased by Plaintiff was NOT provided until 22 months later, though constantly requested. What was purchased on December 7, 2010 was <u>never</u> delivered, a copy of which is attached hereto as Exhibit 62 the contents of which are incorporated herein by reference.

183.     This Complaint referenced the issue asserting Merck and its conspirator employees Defendants and cohorts, provided false and plagiarized study materials to the FDA "after the effective date" (after ORG 34517 was sold to Plaintiff).

184.     Curiously, on November 3, 2009 Merck closed title to the merger of Schering/Organon who were the owners/developers of ORG 34517. Schering/Organon (through Merck) notified the FDA the <u>next</u> day, November 4, 2009, of the "change of corporate ownership (of ORG 34517) Submission Serial No.: 0081" to Merck,  a copy of which is attached hereto as Exhibit 63 the contents of which are incorporated herein by reference.

185.     Yet, after Plaintiff Pop Test purchased ORG 34517 (December 7, 2010), Merck didn't similarly (as required by law) notify the FDA of Plaintiff's ownership ("change of corporate ownership") until 9 months later, by letter of September 30, 2011, Serial No.: 0086, a copy of which is attached hereto as Exhibit 64 the contents of which are incorporated herein by reference.

186.     In this pregnant hiatus, the conspirators filed with the FDA by letter of August 31, 2011, new contact information ("Serial No.: 084") naming (NOT Pop test- the Owner), but Defendant Tracie A. Carey, at Merck, and at their Rahway address (parenthetically, the address of the Merck in-house legal department). A copy of which is attached hereto as Exhibit 65 the contents of which are incorporated herein by reference.

187.     Without the above change of contact to Defendant Carey, the plagiarized FDA filing (below) could not have occurred.

188.     On September 16, 2011, Defendants Tracie Carey and Marty Huber filed with the FDA a "faulty study fraudulently labeled as '2011' and wrongfully submitted to the FDA with the clear intent of sabotage, to label ORG 34517 as a 'Teratogen'", an agent or factor that causes malformation of an embryo (abortion drug). The filing was problematic for, inter-alia, changing the date of a study made in 2004 to 2011; changing the identity of the study director, and in the filing of any report in March, 2011 by Merck and/or with the complicity of its Netherland Defendants and other Defendant employees after December 7, 2010 (the date Plaintiff became the drug owner). The 2004 study had numerous sections and was then relabeled as 2011,  a sample of the many cover sheets, are attached hereto as Exhibit 66 the contents of which are incorporated herein by reference. There is no reason in fact or law, in the regulations, in good laboratory practice, ethical clinical practice or the like for the Defendants to wait seven years to file a 2004 study report with the FDA in 2011, and especially when not owned by the reporter.

189.     Form FDA 1571 (IND) Serial # 85 dated September 16, 2011 from Organon USA, Inc. (Merck) was submitted by Defendants Marty Huber, M.D., Global V.P. Global Pharmacovigilance and Tracie Carie, Global Regulatory Affairs, both of whom are/were employed at Defendants Merck, Rahway, New Jersey office.

This form is required to submit a report to the F.D.A., a copy of which is attached hereto as Exhibit 67 the contents of which are incorporated herein by reference

    a. Form FDA 1571, after Space 118 thereof, states: "Warning: a willfully false statement is a criminal offense U.S.C. Title 18, Section 1001".

    b. The IND FDA document Serial # 85 was false, faulty, fraudulent, re-labeled, etc. and was not owned by Merck at the time the report was submitted, and submitted intentionally for the purpose of sabotaging the Pop Test project.

    c. In this illegal (criminal) filing, the IND for ORG 34517, Space Number 6 of the filing has the drug's IND # 58641 which is the FDA registration filing # for all ORG 34517 filings.

190.    The conspirators Defendants Carey and Huber communicated as to this illegality with Defendant Henkjan Gellekink, Merck's Organon global regulatory affairs scientist in the Netherlands, who was at the same time a Merck/Organon employee, having insight and continuity with the ORG 34517 drug, a signatory to Plaintiff's Confidentiality Agreement, a member of Defendant Chardon, and a co-conspirator with Defendants Peeters and Broekkamp, the former having been terminated by Merck on July 1, 2011 and the latter, to be terminated on November 1, 2011.

191.    The said illegal submission (# 85) filed by Merck and Defendants Carie and Huber was filed on September 16, 2011; only two (2) weeks after the Merck Netherlands Defendants "quit" the Pop Test studies.

192.    A Report was prepared by Teratogen expert Stephen B. Harris Group describing in detail the illegality and inadequacies of these FDA submissions and states why same should not have been filed; a copy of which is attached hereto as Exhibit 68 the contents of which are incorporated herein by reference

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Violation 18 U.S.C. § 1962(c))
### (Against All Defendants)

193.     Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

194.     At all relevant times, Pop Test is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

195.     At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### The RICO Enterprise

196.     The Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the forgoing paragraphs of this Complaint; namely through a multi-faceted campaign of lies, fraud and corruption, to divest Pop Test of its rights in the pharmaceutical compound ORG 34517 and its uses to treat cancer and other conditions.   These Defendants and their co-conspirators have organized their operations with specific individual/group responsibilities for specific activities, operating in the United States and the Netherlands.   During the existence of the operation, the Defendants/co-conspirators have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the nature and scope of their activities.   While the organization of the criminal enterprise has changed overtime, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

a. Merck and the Merck Employee Defendants have acted to misappropriate Pop Test's supply of ORG 34517 and the regulatory documents related thereto and filing false documents related to ORG 34517 with the FDA.

b. The Netherland Defendants have been responsible for oversight of the scheme and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, namely, the misappropriation of Pop Test's supply of ORG 34517, misappropriation of the intellectual property and proprietary information related thereto, providing misleading information the ownership of ORG 34517 and obstructing Pop Test's efforts at uncovering the criminal scheme.

c. The University Defendants have acted to use the ORG 34517 and the intellectual property and proprietary information related thereto for their own benefit and the benefit of the other Defendants and co-conspirators.

197.     The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "Enterprise."  Each of the Defendants participated in the operation or management of the Enterprise.

198.     At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity**

199.     The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c), to wit:

**Pattern of Racketeering Activity:**
**Violation 18 U.S.C. § 1001, False Statements to Governmental Entities**

200.     At all times relevant to this Complaint, Pop Test was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

201.     As described herein, the Defendants have engineered a wide ranging campaign to defraud Pop Test of its rights to ORG 34517 and the intellectual property and proprietary information related thereto for their own benefit.

202.     As described herein, Merck and the Merck Employee Defendants submitted false/misleading documents regarding ORG 34517 IND to the FDA with the intent to defraud Pop Test of its rights in ORG 34517 and the intellectual property and proprietary information related thereto.

203.     As described herein, the University Defendants submitted false/misleading documents to the United States Patent and Trademark Office with the intent to defraud Pop Test of its intellectual property rights in ORG 34517.

204.      The false/misleading documents filed by Merck, the Merck Employee Defendants and the University Defendants have been relied upon by the FDA and USPTO and have caused Pop Test substantial damages.

**Pattern of Racketeering Activity**
**Multiple Instances of Mail Fraud and Wire Fraud**
**in Violation of 18 U.S.C. §§ 1341 and 1343**

205.     As described herein, the Defendants engaged in a wide-ranging scheme or artifice to defraud Pop Test of its rights in ORG 34517 and the intellectual property and proprietary information related thereto.  The ultimate objective of the Defendants' scheme or artifice to defraud is to misappropriate Pop Test's ORG

34517 and the intellectual property and proprietary information related thereto for their own economic benefit.

206.     In furtherance of their scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communications in interstate or foreign commerce, writings, scientific protocols, scientific data, scientific reports, etc. and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate or foreign carrier, including but not limited to the following:

a. e-mails regarding false and misleading statements regarding the ownership of ORG 34517 and the intellectual property and proprietary information related thereto;

b. wirings and/or mailings between and among the Defendants concerning the preparation of a false and misleading study report regarding the activity of ORG 34517;

c. wirings and/or mailings between and among the Defendants regarding the misappropriation of Pop Test's supply of ORG 34517 for their own benefit;

d. wirings and/or mailing between and among the Defendants regarding the misappropriation of Pop Test's rights in the intellectual proprietary information related to ORG 34517 for their own benefit.

e. communications with the U.S. federal government officials and regulators incorporating false and misleading statements regarding ORG 34517 and the intellectual property and proprietary research related thereto;

f. electronic filing of false and misleading reports to the FDA regarding the ORG 34517 IND and filing false and misleading documents with the U.S. Patent and Trademark Office regarding the intellectual property and proprietary information related to ORG 34517; and

      g.  shipment of Pop Test's supply of ORG 34517 using U.S. or Foreign postal services and/or private /commercial interstate/foreign carriers without Pop Test's knowledge or consent.

207.     The Exhibits attached hereto and incorporated by reference set forth particular uses of wire and mail communications in furtherance of the Defendants' scheme or artifice to defraud that constitutes violations of 18 U.S.C. §§ 1341 and 1343, including which individual defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

208.     The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Pop Test for the purposes of misappropriating Pop Test's rights in ORG 34517 and the intellectual property and proprietary information related thereto the facts from which the Defendants' intent to defraud Pop Test are set forth above and in the Exhibits which have been attached hereto and incorporated herein.

209.     The Defendants' false and misleading statements have been relied on by the F.D.A., the U.S. Patent and Trademark Office by means of their acceptance and use of the false and misleading documents filed by the Defendants to the detriment of Pop Test's ability to pursue the prosecution of FDA and patent applications related to ORG 34517 and its uses.  Further, the Defendants' false and misleading statements have caused Pop Test substantial damages.

**Pattern of Racketeering Activity: Violation of 18 U.S.C. § 1832, et. seq.,
The Economic Espionage Act of 1996 ("EEA")**

210.     Pop Test owned valuable proprietary and confidential intellectual property and a valuable proprietary and confidential pharmaceutical product, including but not limited to, patentable inventions, novel formulae/formulations of pharmaceutical products, business data, compilations, methods, techniques, designs, procedures, and the like (collectively referred to as "Pop Test IP").

211.     Pop Test took reasonable measures to keep the Pop Test IP secret, and the Pop Test IP had economic value, actual and potential; the Pop Test IP was not publically known and was not readily ascertainable through proper means by the public.

212.     The Defendants obtained access to the Pop Test IP in confidence and knew or should have known their misappropriation of Pop Test IP was culpable, wrongful, and/or illegal.

213.     As described herein, the Defendants engaged in a wide-ranging scheme or artifice to misappropriate, convert, and/or compromise the Pop Test IP by improper means, including, but not limited to, theft, misrepresentation, fraud, breach of a duty of confidentiality and non-disclosure, concealment, deception, unauthorized copying, unauthorized receiving, and/or unauthorized possession of the Pop Test IP, or attempted to do so knowing Pop Test IP to have been misappropriated without Pop Test's authorization.

214.     Defendants' misappropriation of Pop Test IP violates the Economic Espionage Act of 1996 ("EEA"), 18 U.S.C. § 1832, et. seq.

215.     The Exhibits attached hereto and incorporated by reference set forth particular acts in furtherance of the Defendants' scheme or artifice to misappropriate the Pop Test IP to their own benefit, including which individual defendant was involved with the misappropriation, when the acts of

misappropriation occurred; and how it furthered the scheme to defraud Pop Test of the Pop Test IP.

216.     The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Pop Test of the Pop Test IP, the facts from which the Defendants' intent to defraud Pop Test are set forth above and in the Exhibits which have been attached hereto and incorporated herein.

217.     Pop Test has suffered irreparable harm and damages as a result of the misappropriation of Pop Test IP by the Defendants

## Summary of the Pattern of Racketeering Activity
## Alleged Against Each Defendant

218.     As described herein the University of Chicago in its own right and through its employees has committed acts of mail and wire fraud and filed documents with the U.S. Patent Office which containing false/misleading information regarding the ownership of the Pop Test IP in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 in violation of the EEA.

219.     As described herein Defendant Conzen, in her own right, and on behalf of the University of Chicago and/or the Conzen Lab committed numerous mail and wire fraud violations, including those identified in the Exhibits attached hereto and incorporated herein, and she filed documents with the U.S. Patent and Trademark Office which containing false/misleading information regarding the ownership of the Pop Test IP in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.  Conzen also violated the EEA through her use of the Pop Test IP when she knew or should have known it had been misappropriated.

220.     As described herein Defendant Pan, in his own right, and on behalf of the University of Chicago, filed documents with the U.S. Patent and Trademark Office which contained false/misleading information regarding the ownership of the Pop Test IP in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

221.     As described herein Defendant Kocherginsky, in her own right, and on behalf of the University of Chicago, filed documents with the U.S. Patent and Trademark Office which contained false/misleading information regarding the ownership of the Pop Test IP in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

222.     As described above, Defendant Peeters, in his own right and on behalf of Chardon Pharma, committed numerous mail and wire fraud violations, including those identified in the Exhibits attached hereto and incorporated herein, in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA. Additionally, Peeters obtained access to the Pop Test IP in confidence and knew or should have known their misappropriation of Pop Test IP was culpable, wrongful, and/or illegal.

223.     As described above, Defendant Broekkamp, in his own right and on behalf of Chardon Pharma, committed numerous mail and wire fraud violations, including those identified in the Exhibits attached hereto and incorporated herein, in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA. Additionally, Broekkamp obtained access to the Pop Test IP in confidence and knew

or should have known their misappropriation of Pop Test IP was culpable, wrongful, and/or illegal.

224.    As described herein Defendant Carey, in her own right, and on behalf of Merck, filed documents with the F.D.A. which contained false/misleading information regarding ORG 34517 and its activity in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

225.    As described herein Defendant Huber, in his own right, and on behalf of Merck, filed documents with the F.D.A. which contained false/misleading information regarding ORG 34517 and its activity in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

226.    As described herein Defendant van Rosmalen, in her own right, and on behalf of Merck, committed numerous mail and wire fraud violations, including those identified in the Exhibits attached hereto and incorporated herein in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

227.    As described herein Defendant Gellekink, in his own right, and on behalf of Merck, committed numerous mail and wire fraud violations, including those identified in the Exhibits attached hereto and incorporated herein in furtherance of the Defendants' scheme to defraud Pop Test and to misappropriate Pop Test's rights in ORG 34517 and the Pop Test IP in violation of the EEA.

228.    Each of the Defendants has engaged in multiple predicate acts, as described herein.  The conduct of each of the Defendants described herein constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

229.     Pop Test was injured in its business and property by reason of the Defendants' violation of 18 U.S.C. § 1952(c).  The injuries to Pop Test caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Pop Test's reputation and goodwill; the impairment of Pop Test's executed contracts, including the December 7th Agreement; and the loss of its rights in ORG 34517 and the Pop Test IP.

230.     Further, these injuries to Pop Test were a direct and proximate and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Pop Test is the ultimate victim of the Defendants' unlawful Enterprise.  Pop Test has been and will continue to be injured in its business and property in an amount to be determined at trial.

231.     Pursuant to 18 U.S.C. § 1964(c), Pop Test is entitled to recover treble damages plus costs and attorneys' fees from the Defendants.

232.     Pop Test is further entitled to and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from further use of Pop Test's supply of ORG 34517 and the Pop Test IP, until this Court determines the merits and enters judgment on Pop Test's claims against the Defendants in this action.

WHEREFORE, Pop Test prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
## (Violation 18 U.S.C. § 1962(d))
## (Against All Defendants)

233.     Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

234.     The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(d).

235. Upon information and belief, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

236. Upon information and belief, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. 1962(d).

237. Upon information and belief, the Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

238. Each Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Pop Test. It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

239. As a direct and proximate cause of the Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Pop Test has been injured in its business and property, including damage to Pop Test's reputation and goodwill; the impairment of Pop Test's executed contracts, including the December 7th Agreement; and the loss of its rights in ORG 34517 and the Pop Test IP.

240.     Pursuant to 18 U.S.C. § 1964(c), Pop Test is entitled to recover treble damages plus costs and attorneys' fees from the Defendants.

241.     Pop Test is further entitled to and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from further use of Pop Test's supply of ORG 34517 and the Pop Test IP, until this Court determines the merits and enters judgment on Pop Test's claims against the Defendants in this action.

WHEREFORE, Pop Test prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. 6,011,025)
### (Peeters, van Rosmalen and Conzen)

242.     Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

243.     Pop Test is the owner of U.S. Patent No. 6,011,025 ("the '025 Patent").

244.     Defendants Peeters, van Rosmalen, and Conzen have been and/or are now infringing, directly, literally, and/or under the doctrine of equivalents, and/or jointly and/or indirectly (by way of inducing infringement by others and/or contributing to the infringement by others) the 025 patent, by among other things importing into the United States and using ORG 34517 which is claimed in the '025 patent.  Defendants are thus liable for infringement of the '025 Patent pursuant to 35 U.S.C. § 271.

245.     On information and belief, Defendants Peeters', van Rosmalen's and Conzen's infringement of the '025 Patent is and has been willful.  Defendants Peeters, van Rosmalen, and Conzen have known or should have known of the '025

Patent since its issuance on January 4, 2000.  On information and belief, Defendants Peeters, van Rosmalen, and Conzen should have known of the '025 Patent; its assignment to Pop Test, and the necessity for a license for Defendants to import into and use ORG 34517 which is claimed in the Patent.

246.     On information and belief Defendants Peeters, van Rosmalen, and Conzen have not ceased their willful infringement of the '025 Patent, and disregarded and continues to disregard the fact that their actions constitute infringement of the '025 Patent.  On information and belief, this risk has been known, or is so obvious, that it should have been known to Defendants Peeters, van Rosmalen, and Conzen.

247.     Upon information and belief, Defendants Peeters, van Rosmalen, and Conzen committed these acts of infringement without license or authorization.

248.     As a result of Defendants Peeters, van Rosmalen, and Conzen infringement of the '025 Patent, Pop Test has suffered monetary damages in an amount not yet determined, and Pop Test will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants Peeters, van Rosmalen, and Conzen and their agents from infringing the '025 Patent.

WHEREFORE, Pop Test prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets in Violation of
### New Jersey Statute § 56:15 *et. seq.* The New Jersey Trade Secrets Act)
### (Against Peeters, Broekkamp, Conzen and the other University Defendants)

249.     Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

250.     Pop Test owned valuable proprietary and confidential intellectual property and a valuable proprietary and confidential pharmaceutical

product, including but not limited to, patentable inventions, novel formulae/formulations of pharmaceutical products, business data, compilations, methods, techniques, designs, procedures, and the like -the Pop Test IP.

251.    The Pop Test IP is not ascertainable to persons outside of Pop Test in the absence of confidentiality agreements.

252.    Moreover, The Pop Test IP is extremely important to the success of Pop Test's business and Pop Test derives economic value as a result of the Pop Test IP not being generally known to, and not being readily accessible by proper means by, other persons who can obtain economic value from its disclosure or use.

253.    Pop Test took reasonable measures to keep the Pop Test IP secret, and the Pop Test IP had economic value, actual and potential; the Pop Test IP was not publically known and was not readily ascertainable through proper means by the public.

254.    During the course of the employment of Defendants Peeters and Broekkamp by Pop Test, Pop Test gave Defendants Peeters and Broekkamp access to, the confidential and proprietary Pop Test IP.  This was done with the understanding that such information was confidential and to be used for the sole and exclusive benefit of Pop Test.

255.    Pop Test communicated the Pop Test IP to Defendants Peeters and Breokkamp in confidence pursuant to confidentiality agreements between Pop Test and Peeters and Broekkamp.

256.    Nevertheless, Peeters and Broekkamp, knowing the confidential nature of the Pop Test IP misappropriated, disclosed and used the Pop Test IP to their own and other's competitive advantage, and continue to do so, in violation of the New Jersey Trade Secrets Act.

257.    Additionally, Peeters and Broekkamp disclosed the Pop Test IP to the University Defendants and others who further used the Pop Test IP to their

own and other's competitive advantage, and continue to do so in violaton of the New Jersey Trade Secrets Act.

258.     The misappropriation of the Pop Test IP by Peeters, Broekkamp and Conzen and the other University Defendants has caused and continues to cause injury to Pop Test's property and business.

259.     As described herein, the Defendants Peeters, Broekkamp, Conzen and the other University Defendants willfully, knowingly and maliciously engaged in a wide-ranging scheme or artifice to misappropriate, convert, and/or compromise the Pop Test IP by improper means, including, but not limited to, theft, misrepresentation, fraud, breach of a duty of confidentiality and non-disclosure, concealment, deception, unauthorized copying, unauthorized receiving, and/or unauthorized possession of the Pop Test IP, or attempted to do so knowing Pop Test IP to have been misappropriated without Pop Test's authorization.

260.     Defendants misappropriation of Pop Test IP violates New Jersey Statute § 56:15 et. seq.

261.     The Exhibits attached hereto and incorporated by reference set forth particular acts in furtherance of the Defendants Peeters', Broekkamp's, Conzen's and the other University Defendants' scheme or artifice to misappropriate the Pop Test IP to their own benefit, including which individual defendant was involved with the misappropriation, when the acts of misappropriation occurred; and how it furthered the scheme to defraud Pop Test of the Pop Test IP.

262.     Defendants Peeters, Broekkamp, Conzen and the other University Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Pop Test of the Pop Test IP, the facts from which the Defendants' intent to defraud Pop Test are set forth above and in the Exhibits which have been attached hereto and incorporated herein.

263.     As a result of the misappropriation of the Pop Test IP by Peeters, Broekkamp, Conzen and the other University defendants, Pop Test has suffered monetary damages in an amount not yet determined and Pop Test will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants from using and/or disclosing the Pop Test IP.

WHEREFORE, Pop Test prays for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF
### (Fraud)
### (Against all Defendants)

264.     Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

265.     Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their applications and prosecution of the ORG 34517 FDA application and U.S. Patent applications, and their communications with Pop Test and its agents.  Each and every Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it on his or her behalf.  These false representations are detailed throughout this Complaint and the Exhibits attached hereto and incorporated herein and include the falsified study report submitted in the ORG 34517 FDA application and submission of documents to the U.S. Patent and Trademark Office that provided false and misleading evidence regarding the ownership of the Pop Test IP, as well as, false and misleading communications with Pop Test regarding the status of its ORG 34517 supplies and regarding the activity of ORG 34517 in preclinical carcinogenicity studies.

266.     Defendants made these false representations while knowing that their misrepresentations were materially false and/or their omissions were material.

267.     Defendants further made these misrepresentations and/or omissions with the intent of misappropriating Pop Test's rights in ORG 34517 and the Pop Test IP.

268.     These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Pop Test, the FDA and the U.S. Patent and Trademark Office by means of their acceptance of Defendants' misrepresentations and omissions and their failure to take corrective action.

269.     As a direct, proximate, and foreseeable result of Defendants' fraud, Pop Test has been harmed, including significant pecuniary, reputational, and other damages.  These injuries include significant damage to Defend Pop Test's reputation and goodwill; the impairment of Pop Test's executed contracts, including the December 7th Agreement; and the loss of its rights in ORG 34517 and the Pop Test IP.

270.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Pop Test is entitled to, and should be awarded, punitive damages against each Defendant.

271.     Pop Test is further entitled to and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from further use of Pop Test's supply of ORG 34517 and the Pop Test IP, until this Court determines the merits and enters judgment on Pop Test's claims against the Defendants in this action.

WHEREFORE, Pop Test prays for judgment as set forth below.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract)

### (Against Peeters, Broekkamp)

272.      Pop Test realleges and incorporates herein by reference each and every foregoing paragraph in this Complaint as if set forth in full.

273.      Peeters and Broekkamp signed confidentiality agreements with Pop Test on October 12, 2010 and on March 2, 2011, respectively.

274.      Peeters and Broekkamp breached these agreements when they disclosed the Pop Test IP to Conzen, the other University Defendants and others.

275.      Peeters and Broekkamp have breached and continue to breach the confidentiality agreements.

276.      As a result of the breach of the confidentiality agreements by Peeters and Broekkamp Pop Test has suffered Pop Test has suffered monetary damages in an amount not yet determined and Pop Test will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants from using and/or disclosing the Pop Test IP.

WHEREFORE, Pop Test prays for judgment as set forth below.

## PRAYER FOR RELIEF

### On the First and Second Claims for Relief:

a.  For general damages according to proof at trial, trebled according to statue, 18 U.S.C. 1964(c);

b.  For pre-judgment interest according to statue; and

c.  For Pop Tests' attorneys' fees and costs according to statue, 18 U.S.C. 1964(c).

**On the Third Claim for Relief:**

d.  For a judgment in favor of Pop Test that Defendants Peeters van Rosmalen and Conzen has directly (literally and/or under the doctrine of equivalents), and/or indirectly (by way of inducing infringement by others and/or contributing to the infringement by others) infringed one or more claims of the '025 Patent;

e.  For a permanent injunction enjoining  Defendants Peeters van Rosmalen and Conzen and their agents and employees and all others acting in concert or participation with them, from infringing the '025 Patent;

f.  For damages according to proof at trial (including a reasonable royalty and/or lost profits), costs, expenses, and pre-judgment and post-judgment interest for Defendants Peeters' van Rosmalen's and Conzen's infringement of the '025 Patent;

g.  For a judgment and order finding that Defendants Peeters van Rosmalen and Conzen willfully infringed the '025, and trebling damages according to statute, 35 U.S.C. § 284; and

h.  For a judgment and order that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Pop Test its reasonable attorneys' fees and costs.

**On the First, Second, Third, Fourth, Fifth and Sixth Claims for Relief:**

i.  For general damages according to proof at trial;

j.  For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them from the use and/or disclosure of the Pop Test IP and/or form initiating and/or prosecuting applications

before the FDA and U.S. Patent and Trademarks with regards to ORG 34517 and/or any of its uses, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Pop Test's claims against Defendants in this matter.

### On the Fourth Claim for Relief

k. For a judgment and order requiring Defendants Peeters, Broekkamp, Conzen, and the other University Defendants to convey ownership of any patent or other intellectual property rights they obtained based on the misappropriated Pop Test IP.

### As to All Causes of Action

l. For such legal and equitable relief as the Court may deem Pop Test is entitled to receive.

### JURY DEMAND

Pop Test demands a trial by jury as to all claims that may be tried to a jury.

Dated:  November 17, 2014          Respectfully Submitted,


By: _____
ERNEST R. NUZZO
65 Ramapo Valley Road, Ste 102
Mahwah, N.J. 07430
(201) 512-3200
**Kathy@ernuzzo.com**
Attorney for Plaintiff